**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**FORT MYERS DIVISION**

| | |
|---|---|
| Richard Ryan, Derivatively on Behalf of HERTZ GLOBAL HOLDINGS, INC., <br>　　　　Plaintiff, <br>　　v. <br><br>STEPHEN M. SCHERR, ALEXANDRA BROOKS, COLIN FARMER, JENNIFER FEIKIN, MARK FIELDS, VINCENT J. INTRIERI, MICHAEL GREGORY O'HARA, ANDREW SHANNAHAN, THOMAS WAGNER, EVAGELINE VOUGESSIS, FRAN BERMANZOHN, and JEFFREY NEDELMAN, <br><br>　　　　Defendants, <br><br>　　and <br><br>HERTZ GLOBAL HOLDINGS, INC. <br><br>　　　　Nominal Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) No. <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

<u>**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**</u>

Plaintiff Richard Ryan ("Plaintiff"), by and through his undersigned counsel,

derivatively on behalf of Nominal Defendant Hertz Global Holdings, Inc. ("Hertz" or the

"Company"), submits this Verified Stockholder Derivative Complaint against Defendants

(defined below) and alleges the following upon information and belief, except as to those

allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's

information and belief is based upon, among other things, his counsel's investigation,

which included, *inter alia*, review and analysis of (i) regulatory filings made by Hertz with

the United States Securities and Exchange Commission ("SEC"); (ii) press releases issued

and disseminated by Hertz; (iii) the pleadings and other filings in the securities class action captioned *Doller v. Hertz Global Holdings, Inc.*, *et al.*, Case No. 2:24-cv-00513-JLB-KCD (M.D. Fla.) (the "Securities Class Action")[1] against certain officers and members of the Company's Board of Directors (the "Board") alleging issuance of false and misleading statements of material fact and the omission of material facts necessary to make other statements made not misleading, between January 6, 2023 and April 24, 2024 with respect to Hertz's business, operations, and prospects; (iv) a review of corporate books and records of  Hertz Global Holdings, Inc. ("Hertz Global" or the "Company"), obtained through Plaintiff's demand pursuant to Delaware General Corporation Law Section 220,[2] and (v) other publicly available information concerning Hertz.

## I.

## NATURE AND SUMMARY OF THE ACTION

1.    Hertz is a Delaware corporation with its headquarters located at 8501 Williams Road, 3rd Floor, Estero, FL, 33928.  Hertz rents vehicles through a network of Company-operated rental locations and franchisees and partners under the Hertz, Dollar and Thrifty brands in 160 countries globally.  Hetz is the third-largest car rental company

---

[1] The Securities Class Action complaint is supported by and cites several references to Confidential Witnesses who shall be referred to herein as "CW."

[2] References to HERTZ220-00____ are to the internal Books and Records.  The redactions to the internal books and records produced included non-privileged and relevant information like the names of the officers and directors at the board meetings, and defendants have not provided these names, despite a request to do so, or explained how these redactions are proper.  It is standard business practice that the attendees of these Board meetings included the entire Board, CEO, and CFO, among other senior executives.

in the world in a highly consolidated industry (top 3 firms hold 95% market share). Hertz filed for Chapter 11 bankruptcy in May 2020 and emerged in July 2021.

2.      Despite this bankruptcy and other recent events plaguing Hertz's stock price, Hertz continues to operate with inadequate controls and board level committees, including no disclosure committee, facilitating at least two false and misleading public statements made between January 6, 2023 and April 24, 2024 (the "Relevant Period").

3.      These false and misleading statements, found actionable to withstand a motion to dismiss in the Securities Class Action, arose from Hertz's failed mission to build an EV fleet comprising 25% of Hertz's overall fleet by the end of 2024.

4.      In promoting this new EV business model, Hertz's former Chief Executive Officer ("CEO") and former Chairman of the Board, Defendant Stephen M. Scherr ("Scherr") made regular public statements and participated in multiple nationwide interviews broadcasted over leading American business and financial news network CNBC.

5.      In one interview during a January 6, 2023 CNBC appearance on Squawk on the Street (the "January 6, 2023 CNBC Interview"), Scherr was asked "what is the demand for, for EV rentals?" Scherr responded "EV rental demand is very strong and strong across all aspects of our business." After the interview, CNBC uploaded a video of the interview to its website with the caption, "Hertz CEO Stephen Scherr EV rental demand is strong across all aspects of our business."

6.      On April 27, 2023, Hertz hosted a call with analysts to discuss Hertz's first quarter 2023 results ("Q1 2023 Earnings Call"). During the Q1 2023 Earnings Call,

Defendant Scherr falsely claimed Hertz had "continued growth" across all customer segments and projected growth in EV rentals of five times more than in 2022, even though internally, Scherr knew demand for EVs was declining and stayed low.

7.    Both statements from January 6, 2023 and April 27, 2023 were materially false and misleading and did not accurately reflect the current state of Hertz's EV business, as Scherr had access to Hertz Global's internal systems that tracked fleet composition, performance, demand, utilization, and revenue, which showed that EV demand and utilization were consistently declining.  This was corroborated by at least three CWs.

8.    The internal books and records produced in response to plaintiff's 220 demand also reflect ████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████████████

9.    When Hertz EV strategy appeared to be a drag on overall performance, Hertz attempted to downplay the materiality of these systemic problems in October 2023 by claiming it needed to "tight[en] the EV supply in that channel and more accurately match[] the fleet to demand."

10.    On April 25, 2024, Hertz stock fell significantly, $1.12 per share, or approximately 19.31%, from a closing price of $5.80 per share on April 24, 2024, to close at $4.68 per share on April 25, 2024, when Hertz announced financial results for the first

quarter of the fiscal year ending on December 31, 2023 (the "2023 Fiscal Year"). In a press release and subsequent earnings call with a report that the Company would sell an additional 10,000 EVs, bringing total EV disposals to 30,000, or approximately half of the EV fleet, in order to "bring supply in line with natural demand that's being expressed" and to "bring our fleet inside the demand curve market saw the whole picture of the EV fleet and projected growth in EV rentals.

11.    Director Jeffrey Nedelman advised Hertz that he would resign from the Board of Directors effective January 19, 2024. Two months later, the Company announced that Defendant Scherr was stepping down as CEO and being replaced by Wayne Gilbert West, effective April 1, 2024. Defendants and Hertz gave no explanation for either departure.

12.    These false and misleading statements reflect that  Company's officers and directors were derelict in their duties to ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public; fully and accurately disclose the actual market demand for the EV rentals Hertz had for rent; fully and accurately disclose the profitability of the Company's EV fleet; full and accurate disclosure of the material risks to Hertz financial metrics of the rapidly declining valuation of its EV fleet, and misrepresenting the inadequacy of the Company's internal controls.

13.    On October 10, 2025, the District Court in the Securities Class Action denied the defendants' Motion to Dismiss, finding, *inter alia*, that Hertz had made misleading statements about its EV demand. Securities Class Action, Opinion and Order, ECF No. 74.

14.     The Securities Class Action Opinion and Order denying the motion to dismiss stated that it "doesn't matter that Defendants disclosed EV demand as a risk because "that risk had already materialized. The cautionary language accompanying Defendants' forecast was thus meaningless." *Id*. at 13.  The District Court made this determination even without the benefit of the 220 documents putting the Board and the company on notice that the ████ ████████████████████████████████████ ████████████████████████████████████████████████████████

15.     Rather, the District Court relied on the Company's robust data collection infrastructure.  The District Court's opinion explained that the defendants in the Securities Class Action had sufficient knowledge with "access to these internal systems during the class period, which they acknowledged generated crucial data" and that "it seems incredibly unlikely that Defendants had not somehow learned EV demand was low. At a minimum, the inference of scienter here is 'at least as compelling as any opposing inference of nonfraudulent intent.'" *Id*. at 15.  The Securities Class Action has exposed the Company to massive class-wide liability.

16.     As a result of the foregoing, and as indicated by Judge Dudek in the Securities Class Action, the Company's positive statements about the Company's business, operations, and prospects, compared to actual facts, presented a viable claim that the statements were materially false, misleading, and lacked a reasonable basis.

17.     Given the Individual Defendants' connection to the wrongdoing alleged herein, their substantial likelihood of liability in this action and the related Securities Class Action, and their inability to act independently of one another, a majority of Hertz's current

Board of Directors is incapable of objectively evaluating a demand to initiate litigation against themselves on the Company's behalf.  Accordingly, any such demand would be futile.

## II.

## THE PARTIES

### A.    Plaintiff

18.    Plaintiff is and has continuously been a stockholder of Hertz during the wrongdoing complained of herein through the present.

### B.    Nominal Defendant

19.    Nominal Defendant Hertz is incorporated under the laws of Delaware, and its principal executive offices are located at 8501 Williams Road, 3rd Floor, Estero, Florida 33928. Hertz's common stock trades on the Nasdaq exchange under the symbol "HTZ."

### C.    Individual Defendants

20.    Defendant Jennifer Feikin ("Feikin")  has served as a director of Hertz since July 2021. Feikin serves on the board of directors of the mutual funds Capital Group Private Client Services Funds, Capital Group U.S. Equity Fund, Capital Group Exchange Traded Funds, American Funds International Vantage Fund, American Funds Global Insight Fund, and Emerging Markets Growth Fund. She has also served as a member of the Audit Committee since at least April 2022.

21.    Defendant Mark Fields ("Fields") has served as a director of Hertz since June 2021 and also served as Hertz's interim Chief Executive Officer ("CEO") from

October 2021 through February 2022. Fields previously served as the CEO of Ford Motor Company from 2014-2017. Fields has worked as a Senior Advisor at TPG Capital LP since 2017. He has also served as a director of Qualcomm, Incorporated, TPG Pace Beneficial II Corp., TPG Pace Solutions Corp., Ford Motor Company, and IBM. Fields also serves as on the boards of directors of two private companies: Tanium, a cybersecurity and systems management company, and CLEAResult, a provider of emission-reducing energy solutions.

22.    Defendant Alexandra Brooks ("Brooks") served as the Company's Executive Vice President and Chief Financial Officer ("CFO") from July 2023 to June 2024. Prior to that, defendant Brooks served as the Company's interim CFO from April 2023 to July 2023, the Company's Senior Vice President and Chief Accounting Officer from October 2020 to July 2023, and as Senior Vice President, Internal Audit at Hertz from June 2020  to October 2020.

23.     Defendant Colin Farmer ("Farmer") has served as a member of the Board since June 2021 and Chair of the Board since April 2024. He also previously served as the Board's Lead Director from August 2022 to April 2023.

24.    Defendant Vincent J. Intrieri ("Intrieri") has served as a member of the Board since June 2016 and as a member of the Audit Committee since at least April 2022. He has served as Chair of the Audit Committee since at least April 2022.

25.    Defendant Micheal Gregory O'Hara ("O'Hara") has been a member of the Company's Board since January 19, 2024. He also previously served as a Company director from June 2021 to January 2023.

26.    Defendant Scherr served as CEO and a member of the Company's Board from February 2022 to March 2024, when he resigned declaring "this isn't the job I signed up for."[3]

27.    Defendant Andrew Shannahan ("Shannahan") has been a member of the Company's Board since June 2021.

28.    Defendant Thomas Wagner ("Wagner") has been a member of the Company's Board since June 2021.

29.    Defendant Evangeline Vougessis ("Vougessis") has been a member of the Company's Board since September 2021. She has also served as a member of the Audit Committee since at least April 2022.

30.    Defendants Brooks, Farmer, Feikin, Fields, Intrieri, O'Hara, Scherr, Shannahan, Wagner, and Vougessis are hereinafter referred to collectively as the "Individual Defendants."

31.    Defendants Farmer, Feikin, Fields, Intrieri, O'Hara, Shannahan, Wagner, and Vougessis are collectively referenced herein as the "Director Defendants."

32.    Defendants Brooks and Scherr are together referenced herein as the "Securities Class Action Defendants."

33.    Defendants are Feikin, Intrieri, and Vougessis are collectively referenced herein as the "Audit Committee Defendants."

---

[3]Srah Butcher, *Morning Coffee: Loquacious ex-Goldman Sachs executive tries again to embellish wealth. How to behave at 5am*, efinancialcareers, October 8, 2024 (https://www.efinancialcareers.com/news/stephen-scherr)

34.    The Individual Defendants and Nominal Defendant Hertz are collectively referenced herein as the "Defendants."

**D.    Relevant Non-Parties**

35.    Non-Party West has served as CEO and a member of the Board since April 1, 2024.

36.    Non-Party Frank Blake ("Blake") has served as a member of the Board since August 2024.

37.    Non-Party Lucy Dougherty ("Dougherty") has served as a member of the Board since August 2024.

## III.

## JURISDICTION AND VENUE

38.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Sections 10(b) and 21D of the Securities Exchange Act ("Exchange Act") and SEC Rule 10b-5 promulgated thereunder as well as Section 14(a) of the Exchange Act. The Court has supplemental jurisdiction over the pendent state law claims pursuant to 28 U.S.C. § 1367(a) because the state law claims form part of the same case or controversy. This action is not a collusive one designed to confer jurisdiction on a court of the United States that it would not otherwise have.

39.    This Court has jurisdiction over each Defendant because they reside in this District or have sufficient minimum contacts with this District to render the exercise of jurisdiction by the Court permissible under traditional notions of fair play and

substantial justice. The Court has personal jurisdiction over the Nominal Defendant because it is authorized to do business in this state.

40.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial portion of the transactions and wrongs complained of herein, including the Defendants' primary participation in the wrongful act detailed herein and violation of fiduciary duties owed to Hertz.

## IV.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

41.     At all times relevant to this case, the conduct of the Individual Defendants was governed by well-recognized rules to protect the Company and its stockholders, the members of the public who had invested in Hertz.

42.     Because of their positions as officers and/or directors of the Company and their ability to control its business and corporate affairs, the Individual Defendants owed the Company and its stockholders the fiduciary obligations of good faith, loyalty, and candor and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner

43.     The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its stockholders to benefit all stockholders equally and not in furtherance of their personal interest or benefit.

44.     Each of the Company's directors owes to the Company and its stockholders fiduciary duties of care and loyalty, including good faith, oversight, and

candor, to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.

45.    Because of their positions of control and authority as directors and/or officers of the Company, the Individual Defendants were able to and did, directly and/or indirectly, exercise control over the wrongful acts alleged herein.

46.    To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company. By virtue of such duties, the officers and directors of Hertz were required to do the following:

- Ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

- Conduct the affairs of the Company in a lawful, efficient, and business-like manner to make it possible for the Company to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

- Properly and accurately inform investors and analysts as to the true financial condition of the Company at any given time, make accurate statements about the Company's financial results and prospects, and ensure that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

- Remain informed as to how the Company conducted its operations, and, upon notice of imprudent or unsound conditions or practices, make reasonable inquiry into the nature and cause of such conditions and practices, correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws; and

- Ensure that the Company operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules, and regulations.

47.     The Hertz Board has adopted Corporate Governance Guidelines providing a "framework for the governance of the Company," which state as follows:

**I. *Overall Purpose and Responsibilities of the Board***

The overall purpose of the Board is to oversee the Company's efforts to create longterm value for its stockholders, as well as other stakeholders. As part of this purpose, the Board adheres to what it believes to be sound governance principles, as set forth in these Guidelines. In its oversight role, the Board maintains a sense of responsibility to the Company's stockholders, customers, employees, suppliers and the communities in which it operates. The Board acts as the ultimate decision making body of the Company and advises and oversees management, who are responsible for the day-to-day operations and management of the Company.

48.     In order to create long-term value for stockholders and other stakeholders, the Board's core responsibilities include:

- identifying, reviewing and, where appropriate, approving the financial and business strategies and major corporate actions of the Company and monitoring their implementation and results;

- regularly monitoring the effectiveness of management policies and decisions, including the execution of the Company's strategies;

- identifying, selecting, evaluating and compensating the Chief Executive Officer (the "CEO") and reviewing management succession planning;

- providing oversight as to major risks facing the Company and strategies for their management and mitigation;

\* \* \*

- overseeing efforts to ensure that the Company's business is conducted with the highest standards of ethical conduct and in compliance with applicable laws and regulations;

- overseeing the Company's financial statements and financial reporting process and internal controls; and

\* \* \*

## IV. Duties of Directors

A. *Director Responsibilities*

As part of their duty to exercise their business judgment to act in a manner they reasonably believe to be in the best interest of the Company and its stockholders, directors are expected to be active and engaged in discharging this duty by:

- devoting sufficient time and effort to learn, and keep themselves informed about, the business and operations of the Company and the industries in which it operates;
- making every effort to attend meetings of the Board and the committees on which they serve and to spend the time needed to prepare for these meetings, including reviewing all materials that are provided in advance of the meetings;

- ensuring other existing and future commitments do not materially interfere with their service as a director; and
- meeting as frequently as necessary to discharge their responsibilities.

* * *

B. *Simultaneous Service on Other Boards of Public Companies*

The Company recognizes that directors benefit from service on boards of other companies, so long as such service does not conflict with the interests of the Company. It is expected that, without the approval of the Governance Committee, directors should not serve on the board of directors of more than five public companies (including the Company's Board). In addition, directors who serve as CEO of a public company should generally not serve on more than two outside public company boards (including the Company's Board).

Directors should advise the Chairperson of the Board and the Chair of the Governance Committee before accepting membership on another public company board of directors or any other assignment on the audit committee (or comparable committee) of another public company board of directors, or establishing any significant relationship with any business, institution or other governmental or regulatory entity.

**E.** *Director Orientation and Continuing Education*

Management, with oversight from the Governance Committee, will make available director orientation materials for all newly elected directors to familiarize them with the Company and its business, which may be customized as appropriate to the needs and prior experience of each new Board member. As appropriate, management will coordinate additional educational sessions for directors on matters relevant to the Company and its business. Directors are also encouraged to participate in educational programs relevant to their responsibilities, including programs conducted by third parties.

* * *

**F.** *Standards of Business Conduct*

Directors will comply with the Company's Standards of Business Conduct (the "Standards of Business Conduct"), which affirm the Company's high

standards of business conduct and ethics. The Standards of Business Conduct are part of the Company's continuing effort to comply with all applicable laws, provide an effective program to prevent and detect violations of law, and conduct its business with fairness, honesty and integrity. In the unlikely event of a request for a waiver from compliance, any such request of waiver will be subject to approval by the Board (any director requesting a waiver will not be entitled to vote on such request) and such waiver will be promptly disclosed to stockholders as required by law.

## V.

## SUBSTANTIVE ALLEGATIONS

49.    Hertz offers car rental services to end customers, as well as rideshare companies through its Ride Share Program.  In late 2021, following the electric vehicle trend, Hertz sought to build "the largest EV rental fleet in North America and one of the largest in the world."  In doing so, Hertz began to self-promote its new business model during press interviews and earnings calls.

50.    On October 25, 2021, Hertz reported that it ordered 100,000 Tesla EVs to be received by the end of 2022 in support of its goal to build a fleet comprised of 25% EVs. Hertz also stated it would install new EV charging infrastructure sufficient to service its EV fleet.

51.    Defendants tracked vehicle demand and utilization, among other Key Performance Indicators ("KPIs"), using Hertz's internal systems.  These systems included Tableau, which reported in real-time and by location, car type, utilization by car, cars on rent and other data; CapGuard, which provided graphical utilization data for each fleet category; and the Rate Management System ("RMS"), which priced vehicles according to seasonality and demand.

52.     These tools and systems to track vehicle demand and utilization underscore that Hertz was laser-focused on its EV business, metrics, and projections. Most of Hertz's new car purchases during the Relvant Period were EVs.

53.     According to CWs 1 and 2, Revenue Management ("RM") Analysts responsible for determining rental car pricing and stocking inventory based on demand in their regions, the Individual Defendants had full access to Tableau and CapGuard to review KPIs and other data company-wide. CW2 also generated bi-weekly "CapGuard" reports that CW2 forwarded to CW2's manager, Defelicio dos Santos ("dos Santos") who circulated them to leadership.

54.     In light of this heightened priority to make Hertz an industry titan in the EV car rental market, Hertz knew or would have known whether its statements regarding its EV utilization status were accurate.

55.     The court in the Securities Class Action found certain of these statements actionable when it denied the motion to dismiss and held:

> The complaint checks these boxes. It identifies a confidential witness (CW2) who was Hertz's Revenue Management Analyst for the Midwestern Region "from before the Class Period to February 2023." (Doc. 50 ¶ 20.) And according to this witness, "EV utilization was between 55% to 60% in CW2's Midwestern US region, as well as for 70% to 75% of the other regions in the country, and was at that level throughout CW2's employment and sometimes fell as low as 30% to 35%[.]" (Id. ¶ 99(d).) Considering this evidence, which comes from a witness with access to Hertz's rental data, it's plausible that EV demand was not in fact "very strong" when Scherr claimed it to be. See Mogensen, 15 F. Supp. 3d at 1214-15. Doller has sufficiently shown falsity.

Securities Class Action MTD Opinion Pages 9-10.

**False and Misleading Statement - January 6, 2023**

56.     On January 6, 2023, Defendant Scherr was interviewed by CNBC on its program "Squawk on the Street" (the "January 2023 CNBC Interview"). During the January 2023 CNBC Interview, Defendant Scherr was asked, "what is the demand for, for EV rentals." In response, Defendant Scherr stated, "***EV rental demand is very strong and strong across all aspects of our business***." CNBC uploaded the recorded video onto its website and captioned it, "Hertz CEO Stephen Scherr EV rental demand is strong across all aspects of our business."

57.     Scherr's statement standards in ████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████

58.     At this meeting, ████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
███████████

59.     ████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████

60.     ████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████

**False and Misleading Statement - April 27, 2023**

61.     On April 27, 2023, Hertz held a call with analysts to discuss Hertz's first quarter 2023 results ("Q1 2023 Earnings Call"). During the Q1 2023 Earnings Call, Defendant Scherr falsely claim Hertz had "continued growth" across *all* customer segments and projected growth in EV rentals of five times more than in 2022, even though internally, Defendants knew demand for EVs was declining and stayed low, stating:

> Hertz posted strong results in the first quarter, **reflecting continued growth in demand across our customer segments** and a stable pricing environment in both the U.S. and abroad.
>
> \* \* \*
>
> Our fleet acquisition costs are generally aligned with vehicle delivery timing. As a result, we have been benefiting from recent price declines from EV OEMs. **We are forecasting nearly 2 million EV rentals in 2023, approximately 5x the number of the prior year**.

62.     These statements were materially false and misleading when made because Defendants implied Hertz was experiencing growth across all of its customer segments, including EVs, and boldly predicted growth in 2023 for EVs of five times that in 2022 when, in reality, EV demand had been declining since Q2 2022 and expected to stay depressed because customers did not want to rent EVs due to a lack of sufficient charging stations and they either did not know how to operate them or were dissatisfied with the driving experience of EVs. Thus, Hertz was not seeing "continued growth in demand" and Defendants' forecast of 5x EV growth lacked any reasonable basis, as evidenced by:

   a.  CW1 stated that by Q2 2022, demand for EVs began to decline as customers did not want to use EVs because there were not enough charging stations and customers did not like the driving experience, and demand stayed suppressed through at least CW1's departure in the third quarter 2023;

b. CW1 recalled that EV utilization began declining by Q2 2022 because customers did not want to rent EVs due to lack of charging stations and they did not like the driving experience. CW1 stated that utilization stayed down throughout CW1's tenure and EV utilization was about 20-25% less than ICE vehicle utilization, as would have been reflected in Tableau and CapGuard;

c. CW2 stated that, by the summer of 2022, demand for EVs across the leisure, corporate and government segments had not materialized in any of Hertz's markets due to a lack of charging stations and customers did not know how or like to drive EVs so that EVs were just sitting on the lot taking up space, requiring Hertz to lower its pricing, which still did not increase demand during CW2's tenure;

d. CW2 attended a site visit in the summer of 2022 as part of the "Extra Hands" annual initiative where CW2 personally observed "a bunch of Teslas" sitting in the lot experiencing low utilization;

e. CW2 stated that EV utilization was between 55% to 60% in CW2's Midwestern US region, as well as for 70% to 75% of the other regions in the country, and was at that level throughout CW2's employment and sometimes fell as low as 30% to 35% in CW2's region;

f. CW3 stated that EVs were not being rented during 2022 and 2023 as there were always a ton at the lot because customers did not want to rent EVs as they were unfamiliar with how to operate and charge them;

g. CW1's team was told throughout most of CW1's tenure to give customers an EV rental, even though they had requested an ICE vehicle, so Hertz could report that there were more EVs on the road. CW1 knows this because CW1 viewed the data in the Tableau system which reported, by location, which vehicles were actually reserved by customers versus what was on the road. CW1 recalled that this resulted in a lot of customer complaints, which CW1 learned from the Operations Manager CW1 spoke with multiple times per day;

h. Around February 2023, CW1's team was given a directive from Brady during the monthly Revenue Management All Hands meeting to increase rental prices on EVs to make up for lost revenue on EV rentals but the rate increase hurt overall EV utilization as customers did not want to pay the higher prices;

i. Defendants admitted they had to sell off 50% of Hertz's EV fleet to "tighten[] the EV supply" to "bring supply in line with natural demand that's being expressed" and "bring our fleet inside the demand curve;"

j. Defendants further admitted that, due to Hertz's EV supply in excess of demand, Hertz "realized lower utilization than what we really want to be at on the EV fleet that we have[]" and, thus, Hertz would be replacing half of its EVs, "which were producing lower utilization and replacing that with an ICE car, which we believe will run higher utilization on[;]" and

k. Defendants admitted that Hertz's aggressive purchasing goal to have its fleet consist of 25% EVs by 2024 lacked any reasonable basis and, thus, Hertz was no longer "out to achieve a fixed percentage of our fleet being electric by date and time[]" as Defendants were "***ahead of ourselves in the context of how quickly that will happen***, but that will happen."

## False and Misleading Statement - October 26, 2023

63.     On October 26, 2023, during the Q3 2023 Earnings Call, Defendant Scherr Defendant Scherr participated in an interview on CNBC's Squawk on the Street (the "January 6, 2023 CNBC Interview"). When asked during the January 6, 2023 Interview "what is the demand for, for EV rentals," Scherr responded "EV rental demand is very strong and strong across all aspects of our business." After the interview, CNBC uploaded a video of the interview to its website with the caption, "Hertz CEO Stephen Scherr EV rental demand is strong across all aspects of our business."

64.     The court in the Securities Class Action found this statement to be misleading because a confidential witness (CW2), who was Hertz's Revenue Management Analyst for the Midwestern Region "from before the Class Period to February 2023," stated that EV utilization was between 55% to 60% in CW2's Midwestern US region, as well as for 70% to 75% of the other regions in the country, and was at that level throughout CW2's employment and sometimes fell as low as 30% to 35%[.] Thus, it is "plausible that EV demand was not in fact "very strong" when Scherr claimed it to be." Securities Class Action MTD Opinion at 10.

65.    This statement was also materially false and misleading when made because overall EV rental demand had been declining since the second quarter of 2022 and had stayed depressed as customers did not want to rent EVs due to a lack of sufficient charging stations and/or because they either did not know how to drive EVS or were dissatisfied with the driving experience, as evidenced by:

a. CW1 stated that by Q2 2022, demand for EVs began to decline as customers did not want to use EVs because there were not enough charging stations and customers did not like the driving experience, and demand stayed suppressed through at least CW1's departure in the third quarter 2023;[4]

b. CW1 recalled that EV utilization began to decline by Q2 2022 because customers did not want to rent EVs due to lack of charging stations and they did not like the driving experience. CW1 stated that EV utilization stayed down throughout CW1's tenure at about 20-25% less than ICE vehicle utilization, as would have been reflected in Tableau and CapGuard;[5]

c. CW2 stated that, by the summer of 2022, demand for EVs across the leisure, corporate and government segments had not materialized in any of Hertz's markets due to a lack of charging stations and customers did not know how, or like, to drive EVs so that EVs were just sitting on the lot taking up space, requiring Hertz to lower its pricing, which still did not increase demand during CW2's tenure;[6]

d. CW2 attended a site visit in the summer of 2022 as part of the "Extra Hands" annual initiative where CW2 personally observed "a bunch of Teslas" sitting in the lot experiencing low utilization; CW2 stated that EV utilization was between 55% to 60% in CW2's Midwestern US region, as well as for 70% to 75% of the other regions in the country, and was at that level throughout CW2's employment and sometimes fell as low as 30% to 35% in CW2's region;[7]

e. CW3 stated that during 2022 and 2023, there were always a ton of EVs on the lot because customers did not want to rent EVs as they were unfamiliar with how to operate and charge them;[8]

---

[4] Securities Class Action Amended Complaint ¶ 99a.
[5] *Id*. at 99b.
[6] *Id*. at 99c.
[7] *Id*. at 99d.
[8] *Id*. at 99e.

f.  CW1's team was told throughout most of CW1's tenure to give customers an EV rental, even though they had requested an ICE vehicle, so Hertz could report that there were more EVs on the road. CW1 knows this because CW1 viewed the data in the Tableau system which reported, by location, which vehicles were actually reserved by customers versus what was on the road. CW1 recalled that this resulted in a lot of customer complaints, which CW1 learned from the Operations Managers CW1 spoke with multiple times per day;[9]

g.  Certain defendants admitted they had to sell off 50% of Hertz's EV fleet to "tighten[] the EV supply" to "bring supply in line with natural demand that's being expressed[]" and "bring our fleet inside the demand curve[;]"[10]

h.  Certain defendants further admitted that, due to Hertz's EV supply in excess of demand, Hertz "realized lower utilization than what we really want to be at on the EV fleet that we have[]" and, thus, Hertz would be replacing half of its EVs, "which were producing lower utilization and replacing that with an ICE car, which we believe will run higher utilization on[;]"[11] and

i.  Certain defendants admitted that Hertz's aggressive purchasing goal to have its fleet consist of 25% EVs by 2024 lacked any reasonable basis and, thus, Hertz was no longer "out to achieve a fixed percentage of our fleet being electric by date and time[]" as Defendants were ***ahead of ourselves in the context of how quickly that will happen***."[12]

66.  ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

---

[9] *Id*. at 99f.
[10] *Id*. at 99g.
[11] *Id*. at 99h.
[12] *Id*. at 99i.



67.

68.

69.

70.



71. ████████████████████████████████████

72. █████████████████████████████████████

73. ████████████████████████████████████

**Confidential Witness Testimony**

74.    The CWs outing Hertz for these false and misleading statements were "in a position to know," firsthand, the facts demonstrating EV demand was low.  The CWs included:

- CW1: former RM Analyst from before the Class Period through Q3 2023, oversaw Western Sales Region where CW1 determined rental car pricing and inventory based on demand, reporting to Director Michael Cangialosi;

- CW2: former RM Coordinator for Midwest (before the CP to 2/2023, stocked fleet according to demand and tracked KPIs such as utilization) and Security Project Manager (2/2023 – 10/2023, tracked fleet management and utilization) reported to Dos                                        Santos);                                        and

  CW3: former Outside Wholesale Remarketing Representative from before the Class Period to 1/2024, responsible for selling Hertz's companywide used car fleet, reporting to Andre LaRosa.

75.    According to CWs 1 and 2, Revenue Management ("RM") Analysts responsible for determining rental car pricing and stocking inventory based on demand in their regions, the Individual Defendants had full access to Tableau and CapGuard to review KPIs and other data company-wide. CW2 also generated bi-weekly "CapGuard" reports that CW2 forwarded to CW2's manager, Defelicio dos Santos ("dos Santos") who sponsored them to leadership.

76.    Throughout their tenures, CWs 1 and 2 attended monthly RM All Hands meetings with analysts and managers from all five sales regions, in addition to Darren Arrington, EVP of RM & Fleet Acquisition, who reported to Defendant Scherr. During these meetings, participants reviewed slides of monthly KPIs like utilization, cars on road, and revenues.

77.    The slides were saved in a folder accessible by Defendants and emailed to management.  CWs 1 and 2 confirmed that EV demand and utilization had declined by mid-2022 because customers did not know how, or want, to use EVs and there were not enough charging stations.

78.    CWs 1 and 2 reported that EV demand and utilization was low throughout the Class Period, hovering around 55% to 60% but sometimes going as low as 30% to 35%, and was at least 20-25% less than Internal Combustion Engine ("ICE") vehicle utilization.

79.    CWs 1 and 2 stated that low EV demand and utilization were reflected in Tableau and CapGuard by the latter part of 2022 and throughout 2023 and that the lack of EV demand was raised at the monthly RM All Hands meetings prior to and throughout the Class Period.

80.    Thus, Defendants were aware that EV demand and utilization had declined before the Class Period and remained abysmal throughout, yet they told investors "EV rental demand is very strong and strong across all aspects of our business" and Hertz was "not seeing demand reduction" for EVs.

81.    While Defendants publicly claimed Hertz was "accelerating the build-out of EV charging infrastructure…to serve both our customers and the driving public," CWs 1 and 2 confirmed that one of the primary reasons customers did not want to rent EVs was the lack of available charging stations.

82.    CW2 stated that Hertz put EVs on the lots for rent before there were any onsite charging stations. CW3 corroborated CW2's account, reporting that Hertz did not

start installing charging infrastructure until several months after purchasing and receiving EVs.

83.    CW3, an Outside Wholesale Remarketing Representative responsible for selling used vehicles to dealerships, reported that Hertz began selling EVs due to lack of demand in April 2023, Defendants did not disclose that until Q1 2024 when they finally revealed Hertz would be forced to sell *half* of its EV fleet due to lack of demand.

84.    CW3 reported that CW3's manager, Andre LaRosa, provided Defendants with monthly reports on EV sales from April to the end of 2023 showing EVs available-for-sale increased due to lack of EV demand.  In fact, Defendants admit they monitor demand data, stating "[w]e sit on a lot of [data]. We know where cars are going, we know where people are going…."  (we "see the booking patterns of our customers. We…measure their desires in terms of fleet preferences.").

**Tracking Systems Hertz Used to Monitor Business**

85.    Hertz had an extensive internal monitoring system in place to provide the most current updates on its business, including its latest priority for EVs.

86.    One tracking and monitoring system, Tableau, reported in real-time and by location, car type, utilization by car, cars on rent and other data.

87.    Another tracking and monitoring system, CapGuard, provided graphical utilization data for each fleet category.

88.    The Rate Management System ("RMS") priced vehicles according to seasonality and demand.

89.    These systems "reported, in real-time, on the number and composition of the rental fleet for each location and reservations" and could generate "a slew of reports which could be produced on a very granular level."

90.    Hertz could produce "graphical representation[s] of utilization levels for specific fleet categories, such as ICE and EV vehicles."

91.    According to CWs 1 and 2, Hertz executives had full access to Tableau and CapGuard to review KPIs and other data company-wide, which they acknowledged generated crucial data.

92.    Given these systems, and the constant access to such inside information, it is more than reasonable to infer that Defendants had learned EV demand was low and that the April 27, 2023 and October 26, 2023 statements were knowingly false and misleading when made.

**2023 10-K Filed February 12, 2024**

93.    Hertz filed its 2023 annual report with the SEC on form 10-K on February 12, 2024.

94.    Defendant directors Scherr, Brooks, Bermanzohn, Farmer, Feikin, Fields, Intrieri, O'hara, Shannahan, Vougessis, and Wagner signed the 2023 10-K.

95.    The 2023 10-K made several references to the EV business that were materially false, misleading, and inaccurate.

96.    The 2023 annual report filed on Form 10-K discussed Hertz's strategy to try to control vehicle depreciation and attendant risk by obtaining certain fleet vehicles ("program vehicles") via purchase programs with automobile manufacturers:

29

Program vehicles are purchased under repurchase or guaranteed depreciation programs with vehicle manufacturers wherein the manufacturers agree to repurchase vehicles at a specified price or guarantee the depreciation rate on the vehicles during established repurchase periods, subject to, among other things, certain vehicle condition, mileage and holding period requirements. Repurchase prices under repurchase programs are based on the original cost less a set daily depreciation amount. These repurchase and guaranteed depreciation programs  limit our residual risk with respect to vehicles purchased under the programs and allow us to reduce the variability of depreciation expense for each vehicle. . . . Program vehicles generally provide us with flexibility to increase or reduce the size of our fleet based on market demand. When we increase the percentage of program vehicles, the average age of our fleet decreases since the average holding period for program vehicles is shorter than for non- program vehicles.

97.    The 2023 10-K also assured investors that Hertz regularly monitored the

depreciation rates for its vehicles:

We . . . estimate the residual value of the applicable revenue earning vehicles at the expected time of disposal, considering factors such as make, model and options, age, physical condition, mileage, sale location, time of the year, channel disposition (*e.g.*, auction, retail, dealer direct), historical sales experience for similar vehicles, third-party expectations of resale value and market conditions. The vehicle is depreciated using a rate based on these estimates. Depreciation rates are reviewed on a quarterly basis based on management's ongoing assessment of present and estimated future market conditions, their effect on residual values at the expected time of disposal and any changes to the estimated holding period of the vehicle.

98.    Similarly, the 2023 Form 10-K purported to warn of risks that had already

materialized regarding Hertz's sustained substantial losses on vehicle sales and

experienced increased vehicle depreciation rates:

Forward estimates on vehicle residual values have recently declined, subjecting us to greater risk of losses on vehicle sales, increased depreciation or challenges in meeting collateral requirements in our fleet financing facilities.

Recent data for used vehicles has shown a sudden downward trend in residual values. This data has also suggested that prices in the used vehicle market

could decrease further in 2024. A further reduction in residual values for non-program hold vehicles longer, sustain a substantial loss on the sale for such vehicles or require us to depreciate those vehicles at a more accelerated rate than currently anticipated while we own them.

\* \* \*

If we sustain substantial losses on sale of vehicles[ or, *inter alia*,] depreciation is accelerated . . . it could have a material adverse effect on our results of operations, financial condition, liquidity and cash flows.

99.     The 2023 Form 10-K stated as follows with respect to vehicle depreciation's impact on Hertz's overall financial results for the year:

Depreciation of revenue earning vehicles and lease charges, net increased $1.3 billion in 2023 compared to 2022, of which $1.2 billion is attributed to our Americas RAC segment. The increase in our Americas RAC segment was due to several factors, primarily (i) reduced per unit gains on vehicle dispositions, (ii) an increase in Average Vehicles and (iii) a lower volume of vehicle dispositions. The increase in Americas RAC was partially offset by longer vehicle holding periods.  Additionally, depreciation of revenue earning vehicles and lease charges, net increased compared to 2022 due to the $245 million write-down of the carrying values of the EV Disposal Group resulting from its classification as held for sale in December 2023. Depreciation of revenue earning vehicles and lease charges, net in our International RAC segment increased $116 million in 2023 compared to 2022 due primarily to higher vehicle acquisition costs, an increase in Average Vehicles and reduced per unit gains on vehicle dispositions, partially  offset by a higher volume of  vehicle dispositions in 2023. Depreciation of revenue earning vehicles and lease charges, net in our Americas RAC segment is expected to be impacted in 2024 by several factors: (i) lower per unit depreciation that will be incurred on the EV Disposal Group, (ii) a larger average fleet compared to that held in 2023, (iii) the intended sale of older vehicles during 2024 and (iv) an uncertain residual environment.

100.     The 2023 Form 10-K, signed by eleven defendants, failed to disclose the full extent of the negative impact the EV business was having on Hertz as ███████████

████████████████████████████████████████████████████████



101.    Instead, the 2023 Form 10-K used generic, catch-all language instead of providing specific, tailored information about known risks.   Hertz failed to properly address at least two issues: the actual financial impact of vehicle depreciation and how ▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" *Id.*

102.    The Individual Defendants were aware, or were reckless in not knowing, how severe the EV business was "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮   and that the Company would need to sell both conventional and EVs at significant losses but did not clearly communicate this to investors.

103.    The 220 documents also reflected ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

**Hertz Starts To Give Investors A Look Under The Hood**

104.    On January 11, 2024, Hertz announced the sale of 20,000 EVs (1/3 of its EV fleet) to "better balance supply against expected demand of EVs" and a massive, $245 million write-off, to reduce the asset value of the EVs on its books.

105.    It did so in a form 8-K statin, in relevant part:

Hertz . . . has made the strategic decision to sell approximately 20,000 [EVs] From its U.S. fleet, or about one-third of the global EV fleet. These vehicle dispositions, which were initiated in December 2023 and are expected to take place in an orderly fashion over the course of 2024, will cover multiple makes and models. EVs held for sale will remain eligible for rental within the Company's fleet during the sales process. The Company expects to reinvest

a portion of the proceeds from the sale of EVs into the purchase of [ICE] vehicles to meet customer demand.

The Company's decision to reduce its EV fleet will result in the recognition, during the fourth quarter of 2023, of approximately $245 million of incremental net depreciation expense related to the sale. This non-cash charge represents the write down of the EVs' carrying values as of December 31, 2023 to their fair values, less related expenses associated with the disposition of the vehicles. This charge is in addition to the depreciation expense that the Company will report for the fourth quarter in the ordinary course with respect to the remainder of its fleet. Future depreciation expense on the specific vehicles held for sale is expected to be limited to impacts from changes in the vehicles' condition and general market factors. Any gain or loss associated with the ultimate disposition of any specific EV will be recognized in the period of sale.

\* \* \*

The Company expects this action to better balance supply against expected         demand of EVs.

\* \* \*

Adjusted Corporate EBITDA for the fourth quarter of 2023 will be negatively impacted by the incremental net depreciation expense associated with the EV sales plan, and further burdened by higher depreciation expense in the ordinary course as residual values for vehicles generally fell throughout the quarter greater than previously expected. . . . The Company expects to report a negative Adjusted Corporate EBITDA (excluding the impact of the non-cash charge related to the EV sales plan) for the fourth quarter in the range of ($120 million) to ($130 million).

106.    On March 15, 2024, the Company announced Defendant Scherr was stepping

down as CEO without explanation.

**The Full Truth Exposed**

107.    On April 25, 2024, during pre-market hours, Hertz issued a press release

announcing its first quarter 2024 results revealing significant financial challenges,

particularly related to vehicle depreciation.12 The Q1 2024 Press Release reported an adjusted diluted EPS of ($1.28) for the quarter, well below the consensus estimate of ($0.43), and far worse than the adjusted diluted EPS of $0.39 that the Company had achieved for its first quarter 2023.

108.    The Q1 2024 Press Release discussed the following key issues related to vehicle depreciation costs the Company experienced in the quarter:

> In the first quarter, the Company upsized its EV disposition plan by 10,000 vehicles, for a total of 30,000 EVs intended for sale in 2024. The Company incurred a $195 million charge to vehicle depreciation to write down the EVs held for sale which were remaining in inventory at quarter-end to fair value and recognize the disposition losses on EVs sold in the period.

> Vehicle depreciation in the first quarter of 2024 increased $588 million, or $339 on a per unit basis, primarily driven by deterioration in estimated forward residual values and disposition losses on ICE vehicles compared to gains in the prior year quarter. Additionally, of the $339 per unit increase, $119 was related to EVs held for sale.

> * * *

> Adjusted Corporate EBITDA was negative $567 million in the quarter driven mainly by a $588 million increase in vehicle depreciation compared to the first quarter of 2023, of which $195 million related to EVs held for sale. The Company commenced a broad fleet refresh during the quarter and has revenue and cost initiatives in place to enhance the Company's future profitability.

109.    The Q1 2024 Press Release also quoted Hertz's new CEO West, who indicated that Hertz's fleet size was too large to remain profitable:

> Fleet and direct operating costs weighed on this quarter's performance. . . . We're tackling both issues - getting to the right supply of vehicles at an acceptable capital cost while at the same time driving productivity up and operating costs down. . . . We've put the right strategy in place, and I see a clear path for Hertz to generate sustainable and higher earnings for our shareholders.

34

110.    During the related earnings call, West acknowledged that Hertz's "quarterly results were unacceptable and reflected the impact of a decline in forward residual values used to determine vehicle depreciation, coupled with our EV rationalization and elevated cost structure."

111.    West also reiterated the need to reduce the Company's overall fleet size to remain profitable, stating, in relevant part:

> [T]here are a number of key priorities I'm focused on. It starts with having the right fleet. So, balancing short-term decisions with long-term implications to drive a better return on assets. This includes making sure that we have the right supply and demand balance of our fleet, at the appropriate capital cost.
>
> Decisions around our fleet are based on return on assets and the discipline of fleeting inside the projected demand curve to ensure we achieve favorable revenue per day and revenue per unit performance along with better managing our residual value risk.

112.    During his prepared remarks on the related earnings call, Hertz's Executive Vice President and Chief Operating Officer, Justin Keppy ("Keppy"), reiterated the need to reduce the Company's fleet size to remain profitable:

> We depleted [our vehicle fleet size] throughout the quarter and, by March, our core rental fleet was tighter, up only 2% year-over-year. We plan to maintain tighter as we move into the summer season, which we expect to correlate with improved RPD performance, coupled with easier year-over-year compares.
>
> Looking at the composition of our fleet, we are addressing the mix to lower the average cap cost and reduce the tail of higher mileage vehicles.
>
> Within our RAC fleet, we expect to reduce vehicles with higher mileage by 75% and complete the rotation out of preowned vehicles by early 2025. This fleet refresh is expected to result in lowered vehicle depreciation, lower direct operating expenses, and deliver an improved customer experience.

35

113.    During the same call, defendant Brooks stated as follows:

We recorded an adjusted corporate EBITDA loss of $567 million, which is disappointing and unacceptable.

Although we continue to be impacted by elevated costs . . . the key driver of the loss is the increased vehicle depreciation, which has increased $588 million year over-year.

For the first quarter, DPU [depreciation per unit] was $592, of which $119 was due to incremental vehicle depreciation expense related to the EVs held for sale. We recorded a charge of $195 million to recognize a fair value adjustment for EVs remaining in our inventory at quarter-end, and to recognize losses on those units sold. DPU, excluding the EV charge of $473, is elevated due to declining forward residual estimates.

* * *

Overall, for the quarter, our adjusted corporate EBITDA reflected elevated vehicle depreciation, which was further burdened by the nonrecurring EV charges and an elevated cost structure that does not yet include the benefit of our various cost initiatives.

114.    On this news, the Company's stock price fell $1.12 per share, or 19.31%, for closing price of $5.80 per share on April 24, 2024, to close at $4.68 per share on April 25, 2024.

115.    The following day, on April 26, 2024, Bank of America ("BofA") downgraded Hertz's rating from "Neutral" to "Underperform" and slashed its price target on the Company's stock by 67% to $3.00. BofA attributed its decision to downgrade on the age of Hertz's fleet and its likely need to increase its debt:

Our forecasts subsequently drop. Liquidity is also an increasing concern among investors, as HTZ has an older fleet that will need to be refreshed at a time when used vehicles are dropping and new vehicle prices are softening only modestly.

The [C]ompany has multiple levers to manage its liquidity, but we expect the [C]ompany is likely to end up with more leverage.

**False And Misleading Proxy Statement**

116.    On April 9, 2024, the Company filed its annual proxy statement for the 2024 Fiscal Year with the SEC (the "2024 Proxy Statement"). Defendants Farmer, Feikin, Fields, Intrieri, O'Hara, Scherr, Shannahan, Vougessis, and Wagner solicited the 2024 Proxy Statement pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

117.    The 2024 Proxy Statement asked Hertz stockholders to vote to, among other things, (1) reelect defendants Farmer and Shannahan to the Board for a three-year term ending as of the Company's annual meeting of stockholders in fiscal year 2027; (2) ratify the appointment of Ernst & Young LLP as Hertz's independent registered public accounting firm for the fiscal year ending December 31, 2024; and (3) approve, in a non-binding advisory vote, the compensation of the Company's named executive officers, commonly referred to as "Say-on-pay."

118.    Regarding the Board's role in "Risk Oversight," the 2024 Proxy Statement stated the following:

> Our senior leadership is responsible for identifying, assessing, and managing our exposure to risk. The Board and its committees play an active role in overseeing management's activities and evaluating whether management's operating and financial plans are balanced from a risk/reward perspective. The Board and its committees perform this oversight through a variety of mechanisms. For example, at the full Board level, the Board receives a strategic plan presentation from management each year, and this presentation generally covers management's expectations for the upcoming three-year period. The Board also reviews management's proposed annual operating plan each year. By engaging with management on both strategic and annual

37

planning, the Board can evaluate risk across multiple time-horizons, including long-term (e.g., risks and opportunities related to the future of mobility generally), medium term (e.g., risks and opportunities across the rolling three-year periods generally aligned with our strategic planning cycle), and shorter periods (e.g., risks and opportunities more relevant to our current year plans).

Presentations from and discussions with management are the primary means by which the Board oversees risk. However, the Board also engages in discussions with outside advisors from time-to-time. The Board also relies on the work of its various committees, where more focused risk oversight can occur. Additional detail on the role of the Board's committees in risk oversight follows.

119.   The 2024 Proxy Statement was materially misleading because it failed to disclose that: (i) although Hertz claimed its officers and directors adhered to the Code, the Individual Defendants were violating the Code; (ii) contrary to the 2024 Proxy Statement's descriptions of the Board's risk oversight responsibilities, the Board and its committees did not adequately exercise these functions and were causing or permitting Hertz to issue false and misleading statements; and (iii) the Individual Defendants used "pay-for-performance" rewards when calculating executive compensation despite artificially inflating the Company's value by issuing false and misleading statements.

120.   The 2024 Proxy Statement was further materially misleading because it failed to disclose to investors the following:

   a.   The true negative financial impact of vehicle depreciation on the Company.

   b.    The Company's inability to accurately assess vehicle depreciation.

   c.   The actual market demand for EVs, which was overstated.

      d.   The profitability of the Company's EV fleet, which was too large to be profitable.

      e.   Anticipated losses from the sale of both ICE vehicles and EVs.

      f.   The inadequacy of the Company's internal controls.

121.   As a result, Defendants' positive statements about the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis.

## Motion To Dismiss Denied In Securities Class Action

122.   On October 10, 2025, the District Court in the Securities Class Action denied the defendants' Motion to Dismiss in the Securities Class Action, finding, inter alia, that Hertz had made misleading statements about its bet on EVs, including regarding the Company's EV rental market demand and valuation of its EV fleet. Securities Class Action, Opinion and Order, ECF No. 74.

123.   The decision and opinion credits the confidential witnesses as having an adequate foundation to base their accounts.  MTD Opinion 9-10.

124.   These confidential witnesses included "Hertz's Revenue Management Analyst for the Midwestern Region 'from before the Class Period to February 2023.'''  *Id*.

125.   According to this witness, "EV utilization was between 55% to 60% in CW2's Midwestern US region, as well as for 70% to 75% of the other regions in the country, and was at that level throughout CW2's employment and sometimes fell as low as 30% to 35%[.]" (*Id*. ¶ 99(d).).

126.   The District Court held that "[c]onsidering this evidence, which comes from a witness with access to Hertz's rental data, it's plausible that EV demand was not in fact

"very strong" when Scherr claimed it to be. *See Mogensen*, 15 F. Supp. 3d at 1214-15. Thus, plaintiff "Doller has sufficiently shown falsity." *Id*. at 9-10.

127.    The court viewed these witness statements in context with Hertz announcing that it was betting big on EVs, doubling down on this bet, and even rolling out an "ad campaign specifically designed to showcase its EV fleet." (*Id*. at 2-3; Doc. 50 ¶¶ 58-63.) "So when Hertz's CEO later characterized EV demand as 'very strong,' reasonable investors could have interpreted this statement to mean the bet was paying off. Against this backdrop, Scherr's statement is not immaterial puffery." *Id*. at 11.

128.    The District Court opinion also scrutinized whether the cautionary language can be considered cautionary "if it is nothing more than a front for present problems" and held:

> When Scherr forecasted "nearly 2 million EV rentals in 2023," EV demand had been lagging. So it doesn't matter that Defendants disclosed EV demand as a risk. According to Doller's evidence, that risk had already materialized. The cautionary language accompanying Defendants' forecast was thus meaningless. *See FindWhat*, 658 F.3d at 1299; *S.E.C. v. Merch. Cap., LLC*, 483 F.3d 747, 769 (11th Cir. 2007); *Sec. & Exch. Comm'n v. Quiros*, No. 16-CV-21301, 2016 WL 11578637, at *14 (S.D. Fla. Nov. 21, 2016) ("[C]autionary statements do not render projections about future performance immaterial where the maker of the projections is aware of adverse information about past performance but fails to disclose it."). So, for now, this forecasting statement is actionable.

*Id*. at 13.

129.    Finding adequate allegations of scienter, it noted "the complaint sets forth—in painstaking detail—the internal systems Hertz used to monitor its business. (Doc. 50 ¶¶ 43-54.) These systems 'reported, in real-time, on the number and composition of the rental fleet for each location and reservations' and could generate "a slew of reports which could

be produced on a very granular level.' (*Id.* ¶¶ 44-45.) Hertz could produce "graphical representation[s] of utilization levels for specific fleet categories, such as ICE and EV vehicles." (*Id.* ¶ 48.) Hertz's top brass had access to these internal systems during the class period, which they acknowledged generated crucial data. (*Id.* ¶¶ 50, 53-54, 168, 169, 174.) And, according to Doller's evidence, EV utilization hovered around 55% to 60% for three-fourths of Hertz's domestic markets. Altogether, it seems incredibly unlikely that Defendants had not somehow learned EV demand was low. At a minimum, the inference of scienter here is "at least as compelling as any opposing inference of nonfraudulent intent." *FindWhat*, 658 F.3d at 1300." *Id.* at 15.

130.    The court also rejected Defendants argument "that scienter isn't alleged since nothing shows they actually reviewed any reports or data on EV demand" because "access to such information alone suffices here."

131.    Defendants argument that "nothing shows they actually reviewed any reports or data on EV demand" is also ███████████████████████████████.

132.    █████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████

## DEMAND IS FUTILE

133.   Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

134.   Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' misconduct.

135.   Plaintiff is an owner of Hertz common stock and has been an owner of Hertz common stock since the wrongdoing alleged herein.

136.   Plaintiff has hired counsel experienced in conducting derivative litigation and will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting the Company's rights.

137.   At the time Plaintiff commenced this action, the Board consisted of the following eight defendants Farmer, Wagner, Feikin, Fields, Intrieri, O'Hara, Shannahan, and Vougessis, and three relevant non-parties West, Blake, and Dougherty. The Director Defendants, constituting a majority of the Board, are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action. Plaintiffs need only allege demand futility as to six of eleven Current Directors who are on the Board at the time this amended consolidated complaint is filed.

138.   The Director Defendants all face a substantial likelihood of liability for their individual misconduct. The Director Defendants were directors throughout the time of the false and misleading statements and, as such, had a fiduciary duty to ensure the accuracy

of the Company's SEC filings, press releases, and other public statements and presentations concerning Hertz's business, operations, prospects, internal controls, and financial statements.

139.    They failed to ensure the accuracy of the Company's SEC filings when Defendant directors Scherr, Brooks, Bermanzohn, Farmer, Feikin, Fields, Intrieri, O'hara, Shannahan, Vougessis, and Wagner signed the 2023 10-K, filed February 12, 2024, without expressly disclosing therein that "█████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████████████████.

140.    Moreover, the Director Defendants owed and owe a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls were sufficiently robust and effective and were being implemented effectively, and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care. Instead, they knowingly and consciously reviewed, authorized, and/or caused the publication of the materially false and misleading statements discussed above that caused the Company's stock to trade at artificially inflated prices.

141.    It is also inferred[13] ██████████████████████████████ ████████████████████████████████████████████████

---

[13] As previously noted, the redactions to the internal books and records produced included non-privileged and relevant information like the names of the officers and directors at the board meetings, and defendants have not provided these names, despite a request to do so, or explained how these redactions are proper. It is standard business practice that the attendees of these Board meetings included the entire Board, CEO, and CFO, among other senior executives.



143.    The Director Defendants also approved the 2024 Proxy Statement and, therefore, face a substantial likelihood of personal liability because of the false and misleading statements contained therein.

144.    The Director Defendants face a substantial likelihood of personal liability because of their conscious and knowing authorization of false and misleading statements, their failure to timely correct such statements, their failure to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective and were being implemented effectively, and their failure to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required diligence constitute breaches of the fiduciary duties of loyalty and good faith, for which the Director Defendants face a substantial likelihood of liability.

145.    If the Director Defendants were to bring a suit on behalf of Hertz to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability. For this reason, Plaintiff making a demand would be futile.

146.    The Audit Committee Defendants (defendants Feikin, Intrieri, and Vougessis), as members of the Audit Committee during the Relevant Period, participated in and knowingly approved the filing of false financial statements. More specifically, as members of the Audit Committee, the Audit Committee Defendants were obligated to review the Company's annual and quarterly reports to ensure their accuracy. Instead, the Audit Committee Defendants, as members of the Audit Committee, failed to ensure the integrity of the Company's financial statements and financial reporting process and its systems of internal accounting and financial controls and other financial information provided by the Company, as required by the Audit Committee Charter. For this reason, the Audit Committee Defendants cannot exercise disinterested business judgment in considering a demand.

**Defendants Wagner and Shannahan and Defendants Farmer and O'Hara Have Longstanding Business and Personal Relationship**

147.    Defendant Wagner is Vice Chair of the Board, Co-Founder, Managing Member, and Co-Portfolio Manager of all funds and accounts managed by Knighthead Capital Management, LLC ("Knighthead"), an event-driven and deep-value-focused SEC-registered investment advisor that specializes in investing in companies that need financial and operational restructuring. Wagner is also board chairman of Knighthead Annuity & Life Assurance Company.

148.    Defendant Shannahan is Head of Research and a Partner at Knighthead. Shannahan is also a member of the investment committee of certain funds managed by Knighthead.

149.    Accordingly, based on their personal and business relationship, defendants Wagner and Shannahan could not exercise independent business judgment in considering a demand to investigate and prosecute this action.

150.    Defendant O'Hara is the founder and Senior Managing Director of Certares Management LLC ("Certares Management") and a member of the Management Committee. O'Hara also serves on the board of directors of Certares Holdings, where he is the Head of the Investment Committee, and Certares Real Estate Holdings, where he is a member of the Investment Committee and the Management Committee.

151.    Defendant Farmer is Chair, Senior Managing Director, and the Head of the Management Committee of Certares Management. Farmer also serves on the board of directors of Certares Holdings and is a member of Certares Management's Investment Committee.

152.    Accordingly, based on their personal and business relationship, defendants Farmer and O'Hara could not exercise independent business judgment in considering a demand to investigate and prosecute this action.

153.    Additionally, defendants Wagner, Shannahan, O'Hara, and Farmer lack independence because entities with which they are affiliated acted as the Company's sponsors during its Chapter 11 plan of reorganization. According to the 2024 Proxy Statement:

The structure of our Board was implemented in connection with our successful emergence, on June 30, 2021, from a voluntary Chapter 11 restructuring plan (the "Emergence") that we undertook in the wake of the COVID-19 pandemic. Our Chapter 11 plan of reorganization was sponsored by a group (the "Sponsors") comprised of, among others, funds associated with Knighthead, Certares Management and Certares Opportunities LLC ("Certares Opportunities" and together with Certares Management and their affiliates, "Certares"). As part of the transactions undertaken pursuant to our plan of reorganization, CK Amarillo LP, which is an entity for which Knighthead and Certares Opportunities serve as investment managers, received approximately 41% of Hertz's newly issued shares of common stock as of the Emergence date. In addition, as of June 30, 2021, four Sponsor affiliated individuals became directors on our Board: two directors identified by Knighthead ([Defendant]Wagner and [Defendant] Shannahan) and two directors identified by Certares Opportunities ([Defendant] O'Hara and [Defendant] Farmer). Directors Wagner and O'Hara were subsequently nominated and elected by our stockholders to serve as Class I directors at the 2022 annual meeting of stockholders, and directors Shannahan and Farmer are being nominated for election by our stockholders to serve as Class III directors at the 2024 Annual Meeting.

154.    Thus, Directors are unlikely to take action against Defendants Wagner, Shannahan, O'Hara, and Farmer who are supported by the Company's majority shareholder, CK Amarillo. Defendants Wagner, Shannahan, O'Hara, and Farmer are also unlikely to consider a demand to sue the Individual Defendants which could impact the Company and, in turn, CK Amarillo.

155.    According to the Company's 2025 Proxy Statement, CK Amarillo now owns 58.9% of Hertz Global, thus rendering Hertz Global a "controlled company."

156.    Accordingly, given that Defendants Wagner, Shannahan, O'Hara, and Farmer serve as CK Amarillo's investment managers and CK Amarillo's control and ability to determine the outcome of shareholder votes, it is unlikely that the Directors will

consider a demand to sue Defendants Wagner, Shannahan, O'Hara, or Farmer who, with

the backing of CK Amarillo, may be seen as untouchable at the Company.

157.    In addition, several related party transactions approved by the Audit

Committee involve significant financial arrangements between Hertz and entities

connected with defendants Wagner, Shannahan, O'Hara, and Farmer. According to the

2024 Proxy Statement, the Audit Committee approved the following related party

transactions:

> The Audit Committee has approved each of the following transactions under the
> RPT Policy. None of the transactions involve organizations for which any of our
> independent directors serves as an officer, partner or controlling stockholder.
> During 2022, we entered into a sponsorship agreement with GT Racing, which owns
> a race car competing in the FIA World Endurance Championship circuit. The
> sponsorship agreement grants Hertz commercial, partnership and branding
> opportunities for three years. GT Racing is owned by [defendant] Wagner. During
> 2023, Hertz paid GT Racing $7.9 million in connection with the sponsorship.

> During 2023, we entered into an agreement with Trinity Cyber for the provision of
> hardware, software, and professional services associated with network penetration
> prevention solutions. [Defendant] Wagner is the Chair of, and an investor in Trinity
> Cyber, together with, among others, various funds and other individuals associated
> with Knighthead. During fiscal 2023, Hertz paid Trinity Cyber $1.05 million for its
> cybersecurity services

> We are party to various ordinary-course commercial agreements with entities
> associated with Certares, given Certares' position as an investor in travel, tourism
> and hospitality businesses.

> Agreements with GBT Travel Services UK Limited (d/b/a American Express
> Global Business Travel) or its affiliates (collectively, "Amex GBT"): Under the
> agreements, Amex GBT offers our vehicle rentals through its travel service
> platform, and in return, we pay Amex GBT fees based on the resulting revenue.
> Amex GBT is partially owned by Certares. [Defendant] O'Hara serves as its
> Chairperson. 2023 revenue generated pursuant to the agreements was less than 3%
> of our consolidated gross revenues.

Travel Leaders Group Holdings, LLC (d/b/a Internova Travel Group) ("Internova"): Under our agreement, Internova provides us with rental referrals through associated entities throughout North America. In exchange for these referrals, Hertz pays commissions and fees based on rental volume delivered. Internova is partially owned by Certares and Internova's chief executive officer is the brother of [defendant] O'Hara. In addition, [defendant] Farmer serves on Internova's board of directors. During fiscal year 2023, the revenue generated pursuant to this agreement was less than 1% of our consolidated gross revenues.

158.    Defendants Wagner, Shannahan, O'Hara, and Farmer directly and/or indirectly through their affiliated entities materially profited from these related party transactions and, therefore, they would not be able to impartially consider a demand against the Audit Committee Defendants (defendants Feikin, Intrieri, and Vougessis), who are member of the Audit Committee and, thus, approved these transactions.

159.    Moreover, the Audit Committee Defendants approved these related party transactions. The Audit Committee Defendants cannot exercise independent judgment in considering a demand to investigate and prosecute the claims asserted in this action because it would require them to place these transactions under investigation for potential wrongdoing.

## COUNT I
### Against the Securities Class Action Defendants
### for Contribution under Sections 10(b) and 21D of the Exchange Act

160.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

161.    As set forth above, the motion to dismiss in the Securities Class Action was denied on October 10, 2025.

162.    Hertz, along with the Securities Class Action Defendants (Brooks and Scherr), are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5.  If the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to the Securities Class Action Defendants' willful and/or reckless violations of their obligations as officers and/or directors of Hertz.

163.    Because of their positions of control and authority as officers and/or directors of Hertz, the Securities Class Action Defendants was/were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Hertz, including the wrongful acts complained of herein and in the Securities Class Action.

164.    Accordingly, the Securities Class Action Defendants are liable under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), which creates an implied private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

165.    As such, Hertz is entitled to receive all appropriate contribution or indemnification from the Securities Class Action Defendants.

## COUNT II
### Against the Individual Defendants for
### Violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9

166.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

167.    Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a 9.

168.    The 2024 Proxy Statement violated Section 14(a) and Rule 14a-9 because it solicited Hertz stockholder votes for, inter alia, director reelection, while simultaneously misrepresenting and/or failing to disclose the Company's shortcomings in connection with its retention and addition of subscribers.

169.    The Individual Defendants made untrue statements of material facts and omitted to state material facts necessary to make the statements that were made not misleading in violation of Section 14(a) and Rule 14a-9. By virtue of their positions within the Company and roles in the process and in the preparation of the 2024 Proxy Statement, the Individual Defendants were aware of this information and of their duty to disclose this information in the 2024 Proxy Statement(s).

170.    The Individual Defendants knew that the statements contained in the 2024 Proxy Statement were materially false and misleading.

171.    The omissions and false and misleading statements in the 2024 Proxy Statement are material in that a reasonable stockholder would consider them important in

deciding how to vote on the re-election of directors. Indeed, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the 2024Proxy Statement and in other information reasonably available to stockholders.

172.    As a direct and proximate result of the dissemination of the false and misleading 2024 Proxy Statement that the Individual Defendants used to obtain stockholder approval of and thereby re-elect directors, Nominal Defendant Hertz suffered damage and actual economic losses (*i.e.*, wrongful re-election of directors) in an amount to be determined at trial.

## <u>COUNT III</u>
### Against the Individual Defendants for Breach of Fiduciary Duties

173.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

174.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

175.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Hertz's business and affairs.

176.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision. The Individual Defendants' conduct set forth herein was due to their intentional, reckless, or negligent breach of the fiduciary duties they owed to the Company, as alleged herein. The

Individual Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of Hertz's shareholders.

177.    In the course of fulfilling their duties, the Individual Defendants either knew or recklessly disregarded the unreasonable risks and potential losses arising from their misconduct. Despite this, they caused Hertz to engage in the wrongful conduct alleged herein, fully aware of the substantial risk of harm to the Company.

178.    In doing so, the Individual Defendants breached their fiduciary duties to Hertz and its shareholders and engaged in gross mismanagement of the Company.

179.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Hertz has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

180.    Plaintiff, on behalf of Hertz, has no adequate remedy at law

**COUNT IV**
**Unjust Enrichment**
**Against the Individual Defendants**

181.    Plaintiff hereby incorporates the allegations in the foregoing paragraphs as if fully set forth herein.

182.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material information, the fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of Hertz.

183.    Each of the Defendants received payment from Hertz, in the form of either salary or director fees while actively breaching their fiduciary duties to Hertz.

184.    All the payments and benefits provided to Defendants were at the expense of Hertz. The Company received no benefit from these payments.

185.    Plaintiff, as a shareholder and a representative of Hertz, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

186.    Plaintiff, on behalf of Hertz, has no adequate remedy at law.

## COUNT V
## Waste of Corporate Assets Against the Individual Defendants

187.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

188.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Hertz to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, and to lose assets from investors and customers who no longer trust the Company.

189.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

190.    Plaintiff, on behalf of Hertz, has no adequate remedy at law.

## PRAYER FOR RELIEF

191.   FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

a)      Declaring that the Plaintiff may maintain this action on behalf of Hertz and that Plaintiff is an adequate representative of the Company;

b)      Declaring that the Individual Defendants have breached their fiduciary duties to Hertz;

c)      Determining and awarding to Hertz the damages sustained, or disgorgement or restitution, by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

d)      Directing the Individual Defendants to take all necessary actions to reform and improve Hertz's corporate governance and internal procedures to comply with applicable laws and to protect Hertz and its shareholders from a repeat of the damaging events described herein; e) Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

A. Declaring that Plaintiff may maintain this derivative action on behalf of Hertz and that Plaintiff is a proper and adequate representative of the Company;

B. Awarding the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties and violations of the federal securities laws;

C. Awarding prejudgment interest to the Company;

D. Granting appropriate equitable relief to remedy Individual Defendants' breaches of fiduciary duties and other violations of law;

E. Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees and costs and expenses; and

F. Granting such other and further relief as the Court deems just and proper.

Dated:  March 3, 2026

SQUITIERI & FEARON, LLP
Lee Squitieri (pro hac vice forthcoming)
205 Hudson, 7th Floor
New York, New York 10007
Telephone: (212) 421-6492
Facsimile: (212) 421-6553
lee@SFclasslaw.com

MOORE LAW, PLLC
Fletcher Moore (pro hac vice forthcoming)
30 Wall Street, 8th Floor
New York, New York 10005
(212) 709-8245
fletcher@fmoorelaw.com
*Counsel for Plaintiff*

*/s/ Amelia Ravelo, Esq.*
Amelia M. Ravelo, Esq.
Ravelo Law Firm, PLLC
1221 Brickell Avenue, Suite 900
Miami, Florida 33131
Phone: (305) 488-4357
Email: amelia@ravelolawfirm.com

**VERIFICATION**

I, Richard Ryan, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this day of

28/01/26

Richard Ryan (Jan 28, 2026 14:12:26 PST)

Richard Ryan